**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| ROSEMARY GARITY,<br><br>Plaintiff,<br><br>v.<br><br>PATRICK DONAHOE; MEGAN J. BRENNAN,<br><br>Defendants. | Case No. 2:11-cv-01805-RFB-CWH<br><br>**<u>ORDER</u>**<br><br>**Findings of Fact and Conclusions of Law After Court Trial** |

## I. INTRODUCTION

This case is a race and disability discrimination action. Plaintiff Rosemary Garity worked at the Pahrump Post Office and alleges adverse employment action from her supervisors on the basis of (a) her Caucasian race and (b) her medically documented disabilities, which require minimal reasonable accommodation. The Court held a six-day bench trial in this case from January 16, 2018 through February 8, 2018.

Based on the following findings of fact and conclusions of law, the Court rules in favor of Defendant as to Plaintiff's race discrimination action pursuant to Title VII of the Civil Rights Act of 1964. The Court rules in favor of Plaintiff as to Plaintiff's disability discrimination action pursuant to the Rehabilitation Act of 1973.

## II. PROCEDURAL BACKGROUND

Plaintiff filed the original Complaint against the Postmaster General of the United States Postal Service[1] on November 9, 2011. ECF No. 1. Defendant filed a Motion to Dismiss on January

---

[1] Plaintiff filed her complaint against then-Postmaster General Patrick Donahoe. On February 1, 2015, Megan J. Brennan became the Postmaster General of the United States Postal

18, 2012. ECF No. 7. Plaintiff filed an Amended Complaint on February 6, 2012. ECF No. 12. Defendant filed a Motion to Dismiss the Amended Complaint on March 8, 2012. ECF No. 20.

The Court granted the Motion to Dismiss, and Plaintiff filed a Second Amended Complaint on June 11, 2012. ECF Nos. 28, 30. Defendant filed a Motion to Dismiss the Second Amended Complaint on June 25, 2012. ECF No. 31.

The Court granted in part and denied in part the Motion to Dismiss. ECF No. 40. Plaintiff filed the Third Amended Complaint on February 28, 2013, which is the operative complaint in this matter. ECF No. 43. Plaintiff alleged race discrimination, disability discrimination, retaliation, hostile work environment, and failure to accommodate in violation of Title VII of the Civil Rights Act of 1964. Defendant filed an Answer on March 21, 2013 and an Amended Answer on April 11, 2013. ECF Nos. 45, 47.

The Court entered a scheduling order on April 29, 2013. ECF No. 50. Discovery concluded on October 6, 2014. ECF Nos. 182, 196.

On February 23, 2015, Defendant filed a Motion to Dismiss and Motion for Summary Judgment. ECF Nos. 259, 260. The Court denied the Motion to Dismiss on April 16, 2015. ECF No. 279.

On March 30, 2016, the Court granted in part and denied in part the Motion for Summary Judgment. ECF No. 315. The Court denied the Motion as to Plaintiff's race discrimination and disability discrimination claims, and granted the Motion as to Plaintiff's retaliation, hostile work environment, and failure to accommodate claim. ECF No. 316.

Bench trial that took place on January 16, 17, 18, 19, 24 and February 8, 2018. ECF Nos. 429, 432, 433, 434, 439, 452. On January 25, 2018, Defendant filed the instant Motion for Judgment on Partial Findings. ECF No. 436.

On April 26, 2018, Plaintiff filed the instant Motion to Remedy Trial Deficiencies. ECF No. 470. On July 10, 2018, Plaintiff filed the instant Motion for Ruling on Outstanding Motions. ECF No. 473. On January 9, 2019, Plaintiff filed the instant Motion for Status Conference on Trial Conclusion.

---

Service and was automatically substituted for Patrick Donahoe as Defendant pursuant to Fed. R. Civ. P. 23(d).

### III. JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as the action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*

Venue is proper because the incident from which this dispute arose occurred within Nye County, Nevada.

### IV. FINDINGS OF FACT

Federal Rule of Civil Procedure 52(a)(1) requires the Court to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). The court must make findings sufficient to indicate the factual basis for its ultimate conclusion. Kelley v. Everglades Drainage District, 319 U.S. 415, 422 (1943). The findings must be "explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision." United States v. Alpine Land & Reservoir Co., 697 F.2d 851, 856 (9th Cir.), cert. denied, 464 U.S. 863 (1983) (citations omitted).

Accordingly, following the bench trial and having reviewed all of the evidence and observed all of the witnesses, the Court makes the following findings of fact in this case.

**A. Background Factual Findings**

1. Plaintiff Rosemary Garity was hired by the United States Postal Service ("USPS") on approximately November 3, 2001. Over the course of her first five years with USPS, Plaintiff worked at various locations in Las Vegas, Nevada.

2. On December 8, 2008, Plaintiff transferred stations and began working for the USPS at the Pahrump, Nevada post office as a part-time flexible clerk. Plaintiff was employed at the Pahrump, Nevada post office until approximately December 1, 2011, at which time Plaintiff no longer worked at the USPS.

3. From 2008 though August 26, 2011, Plaintiff was a part-time flexible clerk. Duties of a part-time flexible clerk included sales and customer services at a retail window, distributing primary and one or more secondary schemes of incoming and outgoing

mail, performing collections of mail from post office mailboxes located in the community, and performing bulk mail entry unit work. A part-time flexible clerk was not guaranteed a certain number of hours.

4. Effective August 27, 2011, the Pahrump Post Office no longer provided a part-time flexible clerk position, and Plaintiff and the other two part-time flexible clerks became non-traditional full-time clerks. A non-traditional full-time clerk performed the same functions as a part-time flexible clerk. However, a non-traditional full-time clerk was guaranteed at least approximately 34.5 hours per week if work was available within the employee's work restrictions.

5. Plaintiff is Caucasian.

6. Maria Albertini and Anne Lindsey each held the same position as Plaintiff throughout the relevant time period (part time flexible law clerk prior to August 27, 2011 and non-traditional full-time clerk on and after August 27, 2011). Albertini is Hispanic. Lindsey is Caucasian.

7. Elias Armendariz was Plaintiff's immediate supervisor throughout 2011. He is Hispanic.

8. Debra Blankenship was the Postmaster, Armendariz's supervisor, and Plaintiff's indirect supervisor throughout 2011. She is Caucasian.

**B. Plaintiff's Job Duties & Performance**

9. Part-time flexible clerks were responsible for overflow work that exceeded the capacity of the full-time clerks and for substituting in for full-time clerks during breaks or absences. Part-time flexible clerks were trained on all tasks assigned to full-time clerks but were assigned to tasks on a daily as-needed basis.

10. Pursuant to office policy, work duties could not be taken away from full-time clerks and given to part-time clerks.

11. Plaintiff was qualified for her job as a part-time flexible clerk and was performing satisfactorily. During the relevant time period, no supervisor ever communicated to Plaintiff that her work was unsatisfactory in any way.

C. **Plaintiff's Medical Restrictions**

12. Plaintiff was disabled throughout the relevant time period. Plaintiff had a major depressive disorder, a panic disorder, a generalized anxiety disorder, and an adjustment disorder with anxiety and depression. Plaintiff also had heel spurs, heart valve regurgitation, and labial cancer. Plaintiff experienced frequent chest pain and heel pain.
13. Plaintiff was medically restricted to work no more than five days per work week.
14. Plaintiff was medically restricted to stand no more than four hours per day and walk no more than four hours per day. Plaintiff was medically restricted to be on her feet no more than one hour continuously with fifteen-minute breaks.
15. Plaintiff was medically restricted to driving no more than two hours in a day, up to thirty minutes continuously.
16. Plaintiff was medically restricted to lift no more than twenty pounds.
17. Plaintiff was not medically restricted from performing any clerk duties except for collections, which required driving beyond Plaintiff's physical capacity.
18. Collections was not an essential function of Plaintiff's position.
19. Plaintiff was qualified for, and physically capable of performing, every other duty available at the Pahrump Post Office with minimal accommodations.
20. Plaintiff consistently was able to perform all of the essential functions of her job with minimal accommodation at all times, including throughout 2011.

D. **Preferential Treatment**

1. At the Pahrump Post Office, work became available for clerks beginning at 7:00 AM, when the mail truck arrived every day. At that time, one or more clerks would unload the truck and distribute the mail.
2. Albertini was provided the earliest start time of 6:50 AM, just before the 7:00 AM mail trucks arrived. This start time was preferred by Plaintiff and repeatedly denied to her.
3. Albertini was not trained on collections for the first approximately six months of her employment, from September 2010 through early 2011. Only Plaintiff and Lindsey were required to do collections in that period. Collections is a less preferred task.

4. As of March 2011, Albertini was trained in collections and Plaintiff was no longer performing collections due to medical preclusion from the task. Lindsey performed the majority of collections work even after Albertini was trained.

5. Throughout 2011, Plaintiff was repeatedly scheduled to work fewer hours than Albertini and Lindsey despite Plaintiff's requests to work more hours.

6. In 2011, Albertini worked 1,875.20 hours. Lindsey worked 1,800.07 hours. Plaintiff worked 375.82 hours.

7. Blankenship and Armendariz restricted Plaintiff's hours due to her disability, allegedly because Plaintiff was not medically capable of additional work. However, Plaintiff's documented medical restrictions did not restrict her from successfully working full-time with minimal, reasonable accommodations.

8. Generally, there was not a shortage of work available for part-time flexible clerks. Carriers would sometimes participate in distribution, a task assigned to clerks and not carriers, in the mornings. Overtime hours were often available and were regularly worked by Albertini and Lindsey.

**E. American Postal Workers Union**

9. Through 2011, Plaintiff was a member of the American Postal Workers Union.

10. The collective bargaining agreement between the union and the USPS permitted the union to file grievances with the USPS on behalf of its members.

11. The union had the authority and discretion to withdraw or settle any grievance, even without the affected member's consent or over the affected member's objection.

12. Shortly after she began working for the Pahrump Post Office, Plaintiff was appointed as the shop steward. In this role she represented her coworkers as a union member in disability-related and other matters.

13. In January 2011, union president Katherine Poulus replaced Plaintiff as shop steward for the Pahrump Post Office because union members represented by Plaintiff had complained. Poulus remained in this role until August 2011.

///

**F. Timeline of Adverse Employment Actions and Grievances**

14. In a Pahrump Post Office Climate Survey conducted from November 2 to November 4, 2010, about 45% of Pahrump Post Office employees complained about Plaintiff.
15. In late 2010, Plaintiff applied for disability retirement.
16. On January 6, 2011, Plaintiff faxed medical records detailing her disabilities to Jan Richardson, the nurse at the USPS district office in Las Vegas. These records included documentation of heel spurs, anxiety, and depression.
17. On January 6, 2011, Plaintiff asked for accommodations for her mental and physical conditions. She requested that she be provided light duty when available and that she receive an early start time. She asked to be scheduled five days a week rather than two to three days per week.
18. On January 20, 2011, a request for a Fitness for Duty Examination was submitted as to Plaintiff, noting concern about Plaintiff's welfare and safety to herself and to other employees.
19. On January 26, 2011, Plaintiff attended a Fitness for Duty examination.
20. On January 28, 2011, Plaintiff's Fitness for Duty results indicated that she was fit for duty, capable of working with coworkers, capable of responding appropriately to supervision, and not a risk to self or others.
21. On March 3, 2011, Plaintiff requested change in schedule to begin her shifts at 7:00 AM. On March 4, 2011 Plaintiff's request was disapproved with a note that no operations need to start at 7:00 AM.
22. On March 7, 2011, Plaintiff faxed a medical note to Jan Richardson stating the following medical restrictions:
    a. Plaintiff could be on her feet for one hour continuously and four hours intermittently.
    b. Plaintiff may drive up to thirty minutes continuously.
23. On March 10, 2011, Plaintiff and Blankenship discussed a job offer for light duty that included collections as one of the duties. Plaintiff stated that she needed her doctor to

review the offer and that she could not perform collections. She would not sign the job offer and was therefore sent home from work.

24. On March 30, 2011, Plaintiff accepted a job offer with the following physical requirements: (1) standing continuously for up to one hour, (2) standing intermittently for up to four hours, and (3) driving continuously for up to thirty minutes.

25. On April 16, 2011, Plaintiff worked overtime for approximately 40 minutes.

26. On April 20, 2011, Plaintiff refused to report to the conference room alone with Armendariz for an investigative interview regarding the overtime work after being addressed in an aggressive and confrontational manner.

   a. Armendariz insisted that she do so. Plaintiff expressed that she would not enter a room with Armendariz alone and would not participate in the interview without a steward.
   b. Plaintiff had a right pursuant to contract to halt the investigative interview until she had a steward present. The shop steward, Poulos, was present in the building. Plaintiff had a pending sexual harassment grievance against Armendariz at the time.
   c. Both Armendariz and Plaintiff used raised voices and disrupted the workroom with their argument.
   d. After this verbal altercation, Plaintiff, Armendariz, Blankenship, and Poulos gathered in the conference room.
   e. Plaintiff asked to be represented by the other union steward, Ron Czechorosky, as she had pending complaints against Poulos.
   f. The meeting did not proceed.

27. On April 26, 2011, Plaintiff received notice of a thirty-day suspension based on the April 16 and April 20 incidents.

28. Pursuant to Plaintiff's contract, discipline must be corrective and not punitive.

29. Plaintiff reached out to Jerald Bevens, who was the shop steward for Las Vegas at the time. Though he represented a different geographic area, Bevens agreed to get involved

on Plaintiff's behalf based his perception that the discipline was unusually severe.

30. On May 5, 2011, Bevens filed a grievance on Plaintiff's behalf regarding the thirty-day suspension (grievance number JB745).
    a. Bevens argued that a thirty-day suspension was not progressive discipline and was unwarranted for Plaintiff's first offense.
    b. On September 26, 2011, Plaintiff's thirty-day suspension based on the April 16 and April 20 incidents was reduced to a seven-day suspension.
    c. In subsequent 2012 arbitration regarding grievance number JB745, the arbiter determined that the thirty-day suspension was appropriate. However, Plaintiff had left the post office by this time. Plaintiff never served either the thirty-day suspension nor the seven-day suspension.

31. On approximately May 9, 2011, Plaintiff received notice of removal based on the April 20 incident, effective June 1, 2011.
    a. This discipline was cumulative; it related to the same conduct for which Plaintiff had received a thirty-day suspension two weeks earlier.

32. On May 25, 2011, Bevens filed grievance number JB749A on Plaintiff's behalf to overturn Plaintiff's removal.
    a. On September 26, 2011, the USPS decided to withdraw Plaintiff's termination, reinstate Plaintiff, impose instead a fourteen-day suspension, and offer backpay to the Plaintiff for the period she was off work.
    b. Plaintiff never served the fourteen-day suspension and was never actually terminated.
    c. In 2012 the union abandoned the grievance and it never continued to arbitration.

33. Plaintiff was denied work at the post office, without pay, from mid-June 2011 through early- or mid-October 2011, approximately 18 weeks total.
    a. On March 29, 2012, as a result of the settlement of JB749A, Plaintiff was back-paid approximately $12,222.87 for this period for a total of 405 hours. If

Plaintiff had worked full-time over the 18 weeks, Plaintiff would have worked 720 hours.

b. Bevens filed a grievance on Plaintiff's behalf seeking the additional 315 hours of back pay (grievance number JB749B). On July 12, 2012, the grievance settled and Plaintiff was awarded an additional $2,500 in back pay, which equaled 60 overtime hours (or 90 regular hours) plus interest.

34. On October 3, 2011, Blankenship sent a letter to Plaintiff informing her that per the grievance procedure she was back on the employment roll. Blankenship invited her to return to the Post Office on October 5, 2011 to discuss what jobs Plaintiff could do and to make a job offer.

35. On October 6, 2011, Plaintiff was offered a job for collections via a form completed by Armendariz. Plaintiff had already explained to Blankenship on March 10, 2011 that she could not perform collections due to her documented physical restrictions.

36. Plaintiff obtained a doctor's review dated October 13, 2011 indicating that the collections job was medically unsuitable for Plaintiff.

37. Plaintiff did not work from October 6, 2011 through October 17, 2011.

38. On October 17, 2011, Plaintiff was given a different job offer, which limited her duties to four hours of box mail and forty minutes of second notices certified mail per day. The job offer therefore restricted her to just over 23 hours of work per week.

   a. Plaintiff asserted that this job was not appropriate and noted this objection in writing when she signed the offer. However, she took the position due to her financial need to return to work.

   b. Plaintiff was capable, within her medical restrictions, of working an eight-hour work day. More work was available for Plaintiff.

39. On October 18, 2011, Bevens filed grievance number JB811A on Plaintiff's behalf on the alleged basis of discrimination, a hostile work environment, and the denial of work hours.

   a. On July 20, 2012, the union settled grievance number JB811A and awarded

1 | Plaintiff backpay of $1,900.00 for hours denied to Plaintiff during October and November 2011.

40. On November 29, 2011, Plaintiff requested that her start time change from 12:10 PM to 7:00 AM. The request was disapproved.

41. Plaintiff returned to work on December 1, 2011 and was ordered to leave by Armendariz. He did not give her date for her return. Plaintiff did not return to work after this date.

42. On December 13, 2011, Plaintiff again requested that her start time change from 12:10 PM to 7:00 AM. The request was disapproved in a letter from Blankenship discussing the unavailability of sufficient work at 7:00 AM and the need for work in the early afternoon. Blankenship noted that the request was made for purported medical reasons but that it lacked supporting documentation.

43. In late December 2011 or early January 2012, Plaintiff was notified that she was granted disability retirement.

44. In November 2012, Labor Relations Specialists conducted an investigation at the Pahrump Post Office in response to a letter sent by Plaintiff. The findings stated that Blankenship exhibited unacceptable behavior and poor judgment. Corrective action against Blankenship was recommended. There are no findings of any race-based or disability-based discrimination toward Plaintiff or any other individual.

**V.     CONCLUSIONS OF LAW**

As a preliminary matter, the Court denies Plaintiff's Motion to Remedy Trial Deficiencies. Plaintiff argues that trial testimony and evidence was unfairly limited and requests the opportunity to make a closing argument. The Court finds Plaintiff's arguments to be duplicative of objections made on the record and incorporates its reasoning from the trial record denying Plaintiff's requests. The Court does not find that it abused its broad discretion in managing time and providing time warnings throughout trial. The Court finds that where it limited Plaintiff's presentation of evidence, such evidence was irrelevant to Plaintiff's two remaining claims at trial. The Court finds

it admitted and received all the evidence necessary to fairly decide the claims before it and does not find that it favored Defendant over Plaintiff at trial. The Court also finds that it reasonably exercised its discretion to request post-trial briefs rather than oral closing arguments.

**A. Waiver**

In its Motion for Judgment on Partial Findings, Defendant argues that Plaintiff waived her race and disability discrimination claims because she reached settlement agreements regarding her grievances. Defendant argues that three of Plaintiff's grievances – JB749A (termination, reduced to 14-day suspension never served), JB749B (additional backpay), and JB811A (hostile environment and reduced hours) – were settled in their entirety and were not pursued to arbitration, therefore constituting a complete waiver of discrimination claims arising from the facts alleged in those grievances. A fourth grievance, JB745, was partially settled, and Plaintiff never served the seven-day suspension that remained at issue.

Employees may not waive the "comprehensive statutory rights, remedies and procedural protections" of Title VII without "at least a knowing agreement to arbitrate employment disputes." Prudential Ins. Co. of Am. v. Lai, 42 F.3d 1299, 1304 (9th Cir. 1994). "Just as a knowing agreement to arbitrate disputes covered by the act is required by Title VII, so too a knowing agreement is required under the ADA." Nelson v. Cyprus Bagdad Copper Corp., 119 F.3d 756, 761 (9th Cir. 1997). In both the Title VII and ADA contexts, "the choice must be explicitly presented to the employee and the employee must explicitly agree to waive the specific right in question." Kummetz v. Tech Mold, Inc., 152 F.3d 1153, 1155 (9th Cir. 1998) (quoting Nelson, 119 F.3d at 762 and citing Lai, 42 F.3d at 1304–05). Merely submitting a grievance to the arbitration process does not constitute a waiver of these statutory protections. Alexander v. Gardner-Denver Co., 415 U.S. 36, 52 (1974). Similarly, a settlement agreement does not constitute a waiver unless "expressly conditioned on a waiver of petitioner's cause of action." See id. at 52 n.15. Unions may be empowered on behalf of employees to conclusively bind employees to a settlement agreement's terms. Mahon v. N.L.R.B., 808 F.2d 1342, 1345 (9th Cir. 1987).

The Court finds that the settlements reached in these administrative cases do not constitute knowing, express agreements to release federal claims. Defendant asserts that each settlement

included a "voluntary, deliberate, and informed" waiver of federal claims, but Defendant cites only to evidence in the record of monies paid. While it is clear that Plaintiff accepted monies in exchange for the administrative closure of her claims, the Court does not find that there was any written agreement or any other evidence to show that either Plaintiff, or the union on Plaintiff's behalf, explicitly agreed to waive the right to pursue Plaintiff's statutory claims in federal court. The Court does not find that Plaintiff has waived the statutory protections of Title VII or the Rehabilitation Act. The Defendant's Motion is therefore denied.

### B. Race Discrimination

Plaintiff alleges that her supervisors at the Pahrump Post Office discriminated against her because of her Caucasian race in violation of Title VII. She alleges that Armendariz, a Hispanic male, gave preferential treatment to Albertini, a Hispanic female, as compared to his treatment of Plaintiff and of her Caucasian co-worker Lindsey.

To establish a prima facie case for discrimination under Title VII, a plaintiff must demonstrate that: (1) she belongs to a protected class, (2) she was qualified for her job, (3) she suffered an adverse employment action, and (4) similarly situated individuals outside the protected class were treated more favorably, or other circumstances surrounding the adverse employment action lead to an inference of discrimination. Fonseca v. Sysco Food Servs. of Ariz., Inc., 374 F.3d 840, 847 (9th Cir. 2004). An employment action is adverse if it "materially affects the compensation, terms, conditions or privileges of employment." Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th Cir. 2008).

Once a prima facie case is established, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). A plaintiff may demonstrate a defendant's reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Hernandez v. Spacelabs Med. Inc., 343 F.3d 1107, 1112 (9th Cir. 2003) (internal quotations and citations omitted). "To make this showing of pretext, [a plaintiff] may rely on the evidence proffered in support of his prima facie case. A factfinder may infer the

ultimate fact of retaliation without proof of a discriminatory reason if it rejects a proffered nondiscriminatory reason as unbelievable." Id. "An inference of discrimination can be established . . . by showing that others not in [one's] protected class were treated more favorably." Diaz v. Eagle Produce Ltd. P'ship, 521 F.3d 1201, 1207 (9th Cir. 2008).

A plaintiff need not make a showing of but-for causation to demonstrate race-based discrimination. Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 343 (2013). "It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." Id.

The Court finds that Plaintiff has not shown that similarly situated individuals outside the protected class were treated more favorably. Albertini and Lindsey were similarly situated to Plaintiff and worked as part-time flexible clerks alongside Plaintiff through August 2011. Albertini is Hispanic (outside the protected class), and Lindsey is Caucasian (inside the protected class). The Court finds that Albertini and Lindsey were *both* treated more favorably than Plaintiff. Albertini and Lindsey worked similar hours over the course of 2011: Albertini worked 1,875.20 and Lindsey worked 1,800.07. These hours represent nearly full-time work. Plaintiff, by contrast, worked only 375.82 hours. The Court does find that Albertini was scheduled for the early shift, which Plaintiff preferred and repeatedly requested. But Plaintiff presents no evidence that Lindsey preferred or was disfavored for this shift, only that Plaintiff was. The Court does not find evidence sufficient to support Plaintiff's other allegations of preferential treatment of Albertini.

The Court also finds no other circumstances surrounding the adverse employment actions experienced by Plaintiff support a findings or inference of racial discrimination. As discussed below, the Court does find that the adverse employment action experienced by Plaintiff was a result of Plaintiff's disability. But the Court does not find circumstances suggesting that Plaintiff's Caucasian race motivated Plaintiff's supervisors, in whole or in part, in reducing Plaintiff's scheduling and in seeking her suspension and termination.

**C. Disability Discrimination**

Plaintiff separately alleges that her supervisors at the Pahrump Post Office discriminated

/ / /

against her on the basis of her disabilities. Plaintiff brings this claim pursuant to Section 501 of the Rehabilitation Act of 1973.

"Section 501 of the [Rehabilitation Act] announces a federal government policy to prevent discrimination against the disabled in employment decisions, and expressly encourages federal government employers to employ individuals with disabilities." Lopez v. Johnson, 333 F.3d 959, 961 (9th Cir. 2003). The Ninth Circuit looks to the standards applied under the ADA to determine whether a violation of the Rehabilitation Act occurred in the federal employment context. See id. To establish a prima facie case under the ADA, a plaintiff must first demonstrate that: "(1) he is disabled within the meaning of the ADA; (2) he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) he suffered an adverse employment action because of his disability." Samper v. Providence St. Vincent Med. Ctr., 675 F.3d 1233, 1237 (9th Cir. 2012) (citing Allen v. Pac. Bell, 348 F.3d 1113, 1114 (9th Cir. 2003).

The Ninth Circuit has previously adopted the "motivating factor" standard for causation in the ADA context. Head v. Glacier Nw. Inc., 413 F.3d 1053, 1065 (9th Cir. 2005). The Ninth Circuit observed the ADA's use of causal language ("because of, "by reason of," and "because") absent any "solely" qualifier and concluded that a motivating factor causation standard was consistent with the ADA's plain language and legislative history. Id. at 1063–65.

However, Ninth Circuit law does not control where the Supreme Court has since "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." Miller v. Gammie, 335 F.3d 889, 900 (9th Cir. 2003). Subsequent to the Ninth Circuit's decision in Head, Supreme Court has held that a but-for causation standard, not a motivating factor standard, applies in the context of the Age Discrimination in Employment Act ("ADEA"). Gross v. FBL Financial Servs., 557 U.S. 167, 180 (2009). Like the ADA, the ADEA uses "because of" language absent a "solely" qualifier. See 29 U.S.C. § 623. Absent "any meaningful textual difference between the text[s]" of the ADEA and the ADA, the Court believes it likely that the Supreme Court's reasoning in Gross applies equally to the ADA context, imposing a "but for" causation standard. Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 349 (2013) (relying on Gross to apply a but-for standard to Title VII's antiretaliation provision). The Court

therefore proceeds based on its holding that the higher but-for causation standard applies here. The Court notes that the Gross analysis does not impact the motivating factor standard applied above in the race discrimination context, as that standard is codified by the applicable statute. See Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 349 (2013); 42 U.S.C. § 2000e-2(m).

The Court finds that Plaintiff prevails on her disability discrimination claim. First, Plaintiff is disabled within the meaning of the ADA. Because of her physical disabilities and her anxiety, she required reasonable accommodations of which Defendant was on notice throughout the relevant period, at least as of January 6, 2011.

Second, Plaintiff is able to perform the essential functions of her job with reasonable accommodations. Plaintiff's limitations were entirely consistent with her role as a part-time flexible clerk with the exception of the collections task, which required driving beyond her physical capacity but which was a non-essential component of her work. Plaintiff was qualified for her job. The record contains an absence of complaints about Plaintiff's performance at her assigned tasks, and Blankenship's testimony confirms that Plaintiff's job performance was satisfactory throughout the relevant period.

Third, Plaintiff suffered adverse employment actions because of her disability. The Court finds that Plaintiff was scheduled for substantially fewer hours than her coworkers because of her disabilities. While the other two part-time flexible clerks often worked forty hours a week plus frequent overtime, Plaintiff was regularly scheduled far fewer than forty hours a week, despite her repeated requests to be scheduled at or near five eight-hour days. Plaintiff could perform every aspect of the job except collections, a task that Albertini also did not perform from September 2010 through early 2011 and rarely performed after. The Court finds that this limited schedule was imposed on Plaintiff because her supervisors perceived her to be too disabled to take on more hours. However, Plaintiff's documented medical restrictions permitted a full-time work week, Plaintiff successfully performed her tasks when scheduled, and Plaintiff persistently sought additional hours. It was unreasonable and discriminatory for Plaintiff's supervisors to repeatedly restrict her working hours.

///

The Court further finds that Armendariz and Blankenship's response to the April 16, 2011 incident was disproportionate and contrary to typical post office policy. On April 16, 2011, Plaintiff worked approximately 40 minutes of overtime by failing to take a lunch. Plaintiff believes this additional time was authorized and her supervisors allege it was not, but the Court finds that this fact is not material. Regardless of whether the time was authorized, it was unreasonable and punitive for Plaintiff's supervisors to aggressively attempt to force Plaintiff into a conference room alone with Armendariz, against whom Plaintiff had a pending sexual harassment complaint. The Court finds that this response was specifically designed to exacerbate Plaintiff's anxiety, which was medically documented and well-known to Plaintiff's supervisors. The Court finds that this was done wrongfully to provoke a response from Plaintiff based upon her known mental health issues related to high stress and pressure environments. The Court further finds that Plaintiff was pressured in this way to create a response based upon her disability that could be used to justify reducing her work hours and ultimately terminating her or removing her from the workplace.

Plaintiff's supervisors' subsequent decision to suspend and then remove Plaintiff constituted harsh, over-punitive consequences for the 40 minutes of overtime. The Court finds that Plaintiff's supervisors were motived by their desire to remove an employee whom they generally disliked and perceived to be overly difficult due to her disabilities.

**D. Damages**

Plaintiff was wrongfully under-scheduled and over-punished as a direct but-for result of her disabilities. The Court finds that, absent Defendant's discrimination, Plaintiff could have successfully worked hours comparable to those worked by her coworkers Albertini and Lindsey beginning on at least January 6, 2011. The Court finds that Plaintiff could have worked these hours up until the date that Plaintiff received disability retirement, which was near the very end of December 2011 or early January 2012. The Court finds that Plaintiff would have worked approximately 1,837.6 hours in 2011, the approximate average of Albertini's and Lindsey's hours worked in 2011. Because Plaintiff in fact worked 375.82 hours, the Court finds that Plaintiff would have earned income for an additional 1,461.78 hours of work at Plaintiff's regular pay rate of $25 per hour, a total of $36,544.50. The Court subtracts the $12,222.87, $2,500.00, and $1,900.00

payments Plaintiff already recovered for unworked hours. The Court therefore awards backpay in the amount of $19,921.63, as well as pre-judgment interest.

Compensatory damages for non-economic injuries are generally also available under the Rehabilitation Act. However, the Court had previously issued an order (ECF No. 418) granting Defendant's Motion to Exclude (ECF No. 338) compensatory damages. Thus, Plaintiff will not awarded any compensatory damages in this case.

### VI. JUDGMENT

**IT IS ORDERED** that [436] Defendant's Motion for Judgment on Partial Findings is DENIED.

**IT IS FURTHER ORDERED** that [470] Plaintiff's Motion to Remedy Trial Deficiencies is DENIED.

**IT IS FURTHER ORDERED** that [473] Motion for Ruling on Outstanding Motions and [477] Motion for Status Conference on Trial Conclusion are DENIED as moot.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment for Defendant Megan J. Brennan as to the Title VII race discrimination claim.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment for Plaintiff Rosemary Garity as to the Rehabilitation Act disability discrimination claim.

**IT IS FURTHER ORDERED** that Plaintiff is awarded equitable damages in the amount of $19,921.63. The parties are directed to file with the Court their estimation of pre-judgment interest by April 12, 2019.

**DATED:** <u>March 31, 2019</u>.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**